Joseph A. Mullaney, III, Esq.
**CONSUMER LITIGATION GROUP**
Law Office of Dimitrios Kolovos, LLC
211 West State Street, Suite 204
Media, PA  19063
Tel 610-616-5303
Fax 610-672-1944
Eml JMullaney@ConsumerLitigators.com

Attorneys for the Plaintiffs

**Deleted:** UNITED STATES
DISTRICT COURT .
DISTRICT OF NEW JERSEY .
(Camden Vicinage)¶
WEISBERG LAW, P.C.¶
BY: Matthew B. Weisberg¶
7 South Morton Ave.¶
Morton, PA 19070¶
(610) 690-0801¶
Fax (610) 690-0880¶
<sp>Jeffrey Bowman and Laurie
Bowman¶
Individually & as H/W¶
403 New Jersey Road¶
Browns Mills, NJ 08015¶
Plaintiffs, . NO.: 10-2912¶
v.¶
Wells Fargo Bank, N.A. Wells Fargo
Center¶
Sixth Street & Marquette Avenue¶
Minneapolis, MN 55479¶
And¶
American Bankers Insurance . Jury Trial
of Twelve (12) Jurors Demanded¶
Company of Florida¶
11222 Quail Roost Drive¶
M iami, FL 33157-6543¶
Defendants. ¶
<sp>¶
¶
<#>**Jurisdiction and Venue**¶
<#>This Honorable Court has jurisdiction
over Plaintiff's claims based on diversity
conferred by 28 U.S.C. § 1332;
supplemental jurisdiction over state law
claims is granted by 28 U.S.C. § 1367.¶
**II.  . Parties**¶
Plaintiffs, ¶

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY
(CAMDEN DIVISION)

JEFFREY BOWMAN, a citizen of the
State of Kentucky, individually, and as
husband to Laurie Bowman,

and

LAURIE BOWMAN, a citizen of the State
of Kentucky, individually, and as wife to
Jeffrey Bowman,

Plaintiffs,

v.

WELLS FARGO BANK, N.A., a national
banking association of the United States,

and

AMERICAN BANKERS INSURANCE
COMPANY OF FLORIDA, a corporation
of the State of Florida,

Defendants.

CASE NO.: 1:10-cv-02912-NLH -JS

SECOND AMENDED CIVIL
ACTION COMPLAINT

# I.  INTRODUCTION

Jeffrey Bowman and Laurie Bowman are husband and wife.  They applied

for two consumer loans from Wells Fargo with Laurie as the primary applicant.  As

agent, Wells Fargo offered the Bowmans credit insurance underwritten by

American Bankers Insurance Company of Florida in the event the Bowmans

experienced life events, such as unemployment, that make repayment difficult.

Unemployment coverage was only available to the primary applicant, Laurie.  The

Bowmans accepted the credit insurance, and then subsequently Laurie Bowman

was laid off from her employment.  Laurie applied for coverage under the policies

for each account, and Wells Fargo and ABI fraudulently denied the claims in bad

faith and otherwise without good faith and fair dealings.  Laurie and Jeffrey

sustained significant contractual and extra-contractual damages as a result of the

denials.

# II.  PARTIES

1.  Plaintiff JEFFREY BOWMAN ("Jeffrey") is a citizen and resident of the

State of Kentucky and resides in Breathitt County; he is also a former citizen

and resident of the State of New Jersey.

2.  Plaintiff LAURIE BOWMAN ("Laurie") is a citizen and resident of the

State of Kentucky and resides in Breathitt County; she is also a former

citizen and resident of the State of New Jersey.

**Deleted:** ,

**Deleted:** adult individuals and

**Deleted:** , and are citizens of the State of New Jersey residing at the above-captioned address

**Deleted:** <#>Defendant, Wells Fargo North America ("Wells Fargo"), is a corporation, duly organized and existing under the laws of the state of Minnesota, with its corporate headquarters at the above captioned address. Defendant is a citizen of Minnesota. ¶
<#>Defendant, American Bankers Ins. Co. of Florida, is a corporation duly organized and incorporated under the laws of the state of Florida, with a corporate headquarters at the above captioned address. Defendant is a citizen of Florida.¶
<#>At all times material hereto, Defendants were acting individually, within the course and scope of their authority and employment, and/or through their agents, servants, workers, and/or employees, respectively.¶
<#>At all times material hereto, Defendants acted on behalf of each other as agents, servants, workmen, alter ego's, and/or employees thereof. ¶
**III.  Operative Facts¶**
<#>On or about September 9, 2008, Plaintiffs contacted Wells Fargo towards applying for an unsecured personal line of credit for the purpose of home renovations to accommodate their soon-to-be adopted daughter, Angelina.¶
<#>Plaintiff, Laurie Bowman, had previously been a borrower of Wells Fargo leading her to solicit Wells Fargo for this loan.¶
<#>After communicating with Wells Fargo, Plaintiffs applied for a personal unsecured line of credit and attended a closing at Wells Fargo.¶
<#>Defendant, Jane Doe, broker, believed to be an individual named Mary, coordinated the closing on behalf of Defendant, Wells Fargo.¶
<#>Instead of a personal unsecured line of credit, Mary applied Plaintiff, Laurie Bowman for three loans: (a) an auto finance loan in an amount in excess of $9,000.00; (b) a "cash-on demand" unsecured line of credit in an amount approximately $8,000.00; and (c) an open-end line of credit in the form of a Wells Fargo credit card in an amount approximately $5,000.00.¶
<#>At all times material hereto, Plaintiff, Laurie Bowman, indicated her intent to be the primary applicant on the aforementioned loans with her husband, Plaintiff, Jeffrey Bowman, to become a co-applicant.¶
<#>At the time of the closing, Plaintiff, Laurie Bowman, purchased credit life insurance through Wells Fargo, from Defendant, American Bankers Ins ... [1]

3.   Defendant WELLS FARGO BANK, N.A., a national banking association of the United States, ("WF"), is an artificial person and regularly conducts business in the State of New Jersey and is principally located at Wells Fargo Center, Sixth Street & Marquette Avenue, Minneapolis, MN 55479 where it is a citizen of the State of Minnesota.

4.   Defendant American Bankers Insurance Company of Florida, a corporation of the State of Florida, ("ABI"), is an artificial person and regularly conducts business in the State of New Jersey and is principally located at 11222 Quail Roost Drive, Miami, FL  33157-6543 where it is a citizen of the State of Florida.

### III.  JURISDICTION AND VENUE

5.   Plaintiff repeats the foregoing Paragraphs as if each were reprinted herein below.

6.   Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity) because the Court and Defendants already acquiesced to such an assertion; however, the undersigned makes no representation as to the accuracy of such an assertion.

7.   Supplemental jurisdiction over state law claims is proper pursuant to 28 U.S.C. § 1367.

8.    Personal jurisdiction is proper pursuant to *N.J. Ct. R.* 4:4-4. because the acts,

      omissions, and damages described herein occurred in Burlington County,

      New Jersey and the Defendants purposely availed themselves to the

      privileges of conducting credit and insurance business within New Jersey.

9.    *Forum conveniens* and venue in this Court is proper pursuant to 28 U.S.C. §

      1391(b) because a substantial portion of the acts, transactions, and

      occurrences complained of herein occurred in Burlington County, New

      Jersey.

## IV.  FACTUAL ALLEGATIONS

10.   Plaintiff repeats the foregoing Paragraphs as if each were reprinted herein

      below.

## A.  Background

11.   At all times material and relevant hereto, WF is in the business of selling

      credit to consumers.

12.   At all times material and relevant hereto, ABI is in the business of selling

      credit insurance to consumers.

13.   At all times material and relevant hereto, ABI entices consumers to purchase

      its credit insurance with statements such as:

      a.    "If you're not prepared, your financial security could suffer."

      b.    "Chargegard helps keep your credit card account in good standing."

c.   "If you lose your job involuntarily... Chargegard can make your minimum monthly payments until you return to work."

d.   "Your minimum monthly credit card payments can be made:  up to $10,000 if involuntarily unemployed…"

e.   "Don't wait.  Protect your account now."

f.   "Financial Setbacks Can Strike Without Warning."

g.   "Protect Yourself Today with CHARGEGARD."

h.   "CHARGEGARD is there for you in these uncertain times."

14.   At all times material and relevant hereto, WF and ABI jointly market and publicize the availability of some of their offers of credit and credit insurance in the same media.

15.   At all times material and relevant hereto, WF offers to sell credit and ABI offers to sell credit insurance in the same transactions engaged with consumers.

16.   At all times material and relevant hereto, WF and ABI agreed to use the same solicitations, forms, and documents intended to solicit both the sale of credit and credit insurance.

17.   WF and ABI jointly profit from the simultaneous sale of credit and credit insurance to consumers.

18. At all times material and relevant hereto, WF and ABI are joint venturers or partners; thus, they are liable for each other's acts and omissions.

19. At all times material and relevant hereto, WF and ABI acted within the course and scope of their agency or partnership with each and acted to the benefit and furtherance of each other's objectives; accordingly, each Defendant is individually, jointly, severally, and vicariously liable for each other's acts and/or omissions and resulting damages.

**B.  The Two Credit Accounts and Credit Insurance**

20. On or about September 9, 2008, Laurie and Jeffrey applied for two credit accounts with WF:  a Cash on Demand account ("demand account") and a Visa Credit Card ("credit card account").

21. Plaintiffs applied for the two accounts at WF's location of 4201 Falls Church Road, Mount Laurel, NJ  08054.

22. On or about September 9, 2008, WF's agent, Mary Tzoumakis ("Tzoumakis"), handled the processing of the two account applications and spoke with the Plaintiffs regarding their applications for credit from WF.

23. During said conversation, ABI's agent, Tzoumakis, also solicited Plaintiff's purchase of credit insurance designed and intended to protect the demand account and credit card account against, *inter alia*, death, disability, or unemployment.

24. During said conversation, the Plaintiffs were convinced that they could benefit from credit insurance both having experienced employment insecurity.

25. During said conversation, Laurie intended to be the primary applicant on the two accounts and on the credit insurance policy.

26. On or before September 9, 2008, Laurie previously borrowed from WF and considered herself to the be the primary applicant based on her established relationship with WF.

27. Laurie and Jeffrey considered Laurie to be the more insecure of the two in terms of their continued employment.

28. During said conversation, Jeffrey intended to be the co-applicant on the two accounts and on the credit insurance policy.

29. During said conversation, WF and ABI's joint agent, Tzoumakis, and the Plaintiffs agreed to contract for the two accounts and the credit insurance.

30. Tzoumakis presented two non-negotiable and pre-typed contracts containing the terms and conditions of the two accounts and the credit insurance.

31. WF and ABI used said contracts to jointly and in partnership solicit the Plaintiffs to purchase credit and credit insurance.

32. WF and ABI and the Plaintiff engaged in a single contract transaction resulting in the offer, sale, and purchase of credit and credit insurance.

33. Tzoumakis presented said contracts with Laurie identified as the primary applicant and Jeffrey as the co-applicant.

34. WF, ABI, Tzoumakis, Laurie, and Jeffrey intended and agreed that Laurie would be the primary applicant and Jeffrey would be the co-applicant.

35. Laurie signed the credit agreements for the two accounts as the primary applicant and card holder, and Jeffrey signed the credit agreements for the two accounts as the co-applicant.

36. Laurie asked Tzoumakis where they needed to sign to purchase the credit insurance because there was only one line for a signature.

37. Tzoumakis advised that it did not matter in what order Laurie and Jeffrey signed as long as they did not sign the line indicating a rejection of the credit insurance.

38. Tzoumakis advised Laurie and Jeffrey to both sign the credit insurance contracts without advising as to the importance of the signing order.

39. Laurie and Jeffrey signed the agreements for the credit insurance, but because Tzoumakis handed the documents to Jeffrey, he signed the credit insurance agreement first and Laurie second.

40. On or about September 9, 2008, WF issued the demand account ending in account number 7446 with an $8500.00 credit limit.

41.     On or about September 9, 2008, WF issued the credit card account ending in account number 6210 with a $5000.00 credit limit.

42.     On or about September 10, 2008, ABI issued a credit insurance policy consisting of three Certificates protecting the Plaintiffs' credit card account.

43.     Said policy protected the credit card account in the event of Laurie's involuntary unemployment, disability, and/or death.

44.     Said policy protected the credit card account in the event of Jeffrey's death.

45.     The Unemployment Certificate stated that the Primary Cardholder is the person in whose name the account is issued and that if the account is issued in more than one name, the Primary Cardholder is deemed the person who is first on the billing statement.

46.     Said Unemployment Certificate agreed to pay the scheduled minimum monthly payments on the credit card account after a 30-day waiting period retroactively to the first day of unemployment.

47.     The Life Insurance Certificate stated that it covered the first insured debtor's and the joint insured's lives.

48.     The Disability Insurance Certificate stated that the first insured debtor was Laurie.

49.     On or about September 11, 2008, ABI issued a credit insurance policy consisting of three Certificates protecting the Plaintiffs' demand account.

50. Said policy should have protected the demand account in the event of Laurie's involuntary unemployment, disability, and/or death.

51. Said policy should have protected the credit card account in the event of Jeffrey's death.

52. The Unemployment Certificate stated that the Primary Cardholder is the person in whose name the account is issued and that if the account is issued in more than one name, the Primary Cardholder is deemed the person who is first on the billing statement.

53. Said Unemployment Certificate agreed to pay the scheduled minimum monthly payments on the demand account after a 30-day waiting period retroactively to the first day of unemployment.

54. The Life Insurance Certificate stated that it covered the first insured debtor's and the joint insured's lives.

55. The Disability Insurance Certificate incorrectly stated that the first insured debtor was Jeffrey despite Laurie's status as the Primary Cardholder; WF and ABI corrected the misstatement on or about June 29, 2010.

**C.  The Insured Loss - Unemployment**

56. On or about November 19, 2008, Laurie was involuntarily unemployed as the result of an employment layoff.

57. On or about November 22, 2008, Laurie notified WF that she lost her job, and completed a Unemployment Claim Form for unemployment benefits from ABI regarding the two accounts.

58. On or about December 5, 2008, ABI mailed an acknowledgment of Laurie's claim for unemployment benefits regarding the credit card account.

59. On or about December 9, 2008, ABI mailed an acknowledgment of Laurie's claim for unemployment benefits regarding the demand account.

60. On or about December 10, 2008, ABI mailed a letter to Laurie denying her claim for unemployment benefits regarding the demand account alleging that she was not the primary card holder.

61. Said letter did not describe Laurie's internal appeal rights or the right to seek the assistance from the New Jersey insurance ombudsman. *See* N.J.A.C. § 11:25-2.3 & 2.5(a).

62. On or about January 20, 2009, ABI mailed a letter to Laurie denying her claim for unemployment benefits regarding the credit card account alleging that she was not the primary card holder.

63. Said letter did not describe Laurie's internal appeal rights or the right to seek the assistance from the New Jersey insurance ombudsman. *See* N.J.A.C. § 11:25-2.3 & 2.5(a).

64.  Laurie contacted ABI regarding the denials and it advised Laurie that it did
     not have a copy of the contracts for the two accounts and that WF advised
     ABI that Jeffrey was the primary card holder and Laurie was the co-
     applicant.

65.  Despite ABI issuing credit insurance in Laurie's name, and despite ABI
     owing independent duties to Laurie, ABI denied her claims based on the
     opinions of WF as to who was the primary card holder for the two accounts.

66.  Neither WF nor ABI advised Laurie or Jeffrey at any time of the right to
     appeal the decisions to an internal appeals panel and to the New Jersey
     Insurance Claims Ombudsman.  *See* N.J.A.C. § 11:25-2.3 & 2.5(a).

**D.  The Damages**

67.  When the Laurie and Jeffrey were not able to maintain their payments on the
     two accounts, WF aggressively tried to collect payments including excessive
     calls to each Plaintiff for each of the two accounts.

68.  When the Laurie and Jeffrey were not able to maintain their payments on the
     two accounts, WF harassed Laurie and Jeffrey by excessively calling them
     both on the two accounts and sending numerous dunning letters despite
     WF's knowledge that Laurie should have obtained unemployment benefits.

69.  When Laurie and Jeffrey were not able to maintain their payments on the
     two accounts and when ABI denied coverage intended to protect against
     same, Laurie and Jeffrey sustained financial losses including, *inter alia*:

     a.  Late fees and other fees charged by WF;

     b.  Decreased credit limits;

     c.  Lost and reduced credit opportunities;

     d.  Damages to their credit reputation;

     e.  Selling their family home at a loss to escape further financial ruin; and

     f.  Premature withdraws from Jeffrey's retirement accounts to make up
         for shortfalls that should have been paid by ABI.

70.  When Laurie and Jeffrey were not able to maintain their payments on the
     two accounts and when ABI denied coverage intended to protect against
     same, Jeffrey experienced lost productivity at his place of employment
     resulting in the loss of his employment.

71.  WF's harassment of Laurie and Jeffry caused Jeffrey to experience lost
     productivity at his place of employment resulting in the loss of his
     employment.

72.  WF and ABI proximately caused severe emotional distress suffered by
     Laurie and Jeffrey as a result of WF and ABI's refusal and delay in paying
     benefits lawfully owed.

73.  WF proximately caused severe emotional distress suffered by Laurie and Jeffrey as a result of WF campaign of collection harassment when it knew ABI should have paid the minimum payments on the two accounts.

74.  WF and ABI proximately caused a deteriorated marital relationship between Laurie and Jeffrey and loss of services and society and loss of income as a result of ABI's refusal and delay in paying benefits lawfully owed; their dealing with WF's campaign of collection harassment; and the consequential damages flowing from ABI's refusal and delay in paying benefits lawfully owed.

75.  Jeffrey depended on Laurie's income being insured to the extent that ABI would make her minimum payments on the two accounts for her, and Jeffrey sustained damages as a result of his wife not having replacement income to make those payments.

76.  Although ABI changed its position and eventually provided benefits under the credit insurance, the damages sustained by Laurie and Jeffrey were already substantial and irreversible.

77.  Insurance benefits ultimately paid by ABI were insufficient to make Laurie and Jeffrey whole and were inadequate to cover their losses as a result of the previous ongoing denial of benefits.

78.   Insurance benefits ultimately paid by ABI were not in accordance with the insurance contracts, and ABI still owes unpaid benefits.

**V.  COUNT ONE**
**(Bad-Faith Refusal and Delay of Payment of First-Party Claims)**

79.   Plaintiff repeats the foregoing Paragraphs as if each was reprinted herein below.

80.   ABI's denial of Laurie's unemployment claim regarding her credit card account was egregiously unreasonable, *inter alia*, because:

   a.   ABI issued an insurance policy in Laurie's name;

   b.   ABI knew or should have known that it issued a policy in Laurie's name;

   c.   ABI issued a Disability Insurance certificate in Laurie's name identifying her as the first insured debtor;

   d.   ABI stated that Laurie was the first insured debtor;

   e.   ABI knew or should have known that WF designated Laurie as the primary card holder;

   f.   ABI knew or should have known that Laurie designated herself as the primary card holder and applicant;

   g.   ABI knew or should have known that Laurie was the person named first on the billing statement at the time of her loss;

h.   ABI knew that Laurie and not Jeffrey was the claimant for
     unemployment benefits;

i.   ABI knew or should have known that WF mailed a letter addressed to
     Laurie enclosing ABI's insurance certificates intended for her as the
     primary card holder and first insured debtor;

j.   ABI drafted, completed, and processed an internal Initial Claim Form
     Information Sheet in which WF identified Laurie's customer status as
     primary;

k.   ABI was advised by Laurie on numerous occasions that she was the
     primary card holder and first insured debtor and that Jeffrey was the
     co-applicant;

l.   ABI was advised by Laurie that she signed the WF credit contract as
     the first applicant;

m.   ABI was advised by Laurie that she was the primary card holder and
     first insured debtor;

n.   ABI admitted that Laurie was the primary card holder; and

o.   ABI paid part, although not all, of the Laurie's insurance claim
     demonstrating her ownership of the policy.

81.   ABI's denial of Laurie's unemployment claim regarding her demand
      account was egregiously unreasonable, *inter alia*, because:

a.   ABI should have issued an insurance policy in Laurie's name as a result of her status as first applicant and primary card holder;

b.   ABI knew or should have known that it should have issued a policy in Laurie's name as a result of her status as first applicant and primary card holder;

c.   ABI should have issued a Disability Insurance certificate in Laurie's name as a result of her status as first applicant and primary card holder;

d.   ABI should have stated that Laurie was the primary card holder and first insured debtor;

e.   ABI knew or should have known that WF designated Laurie as the primary card holder;

f.   ABI knew or should have known that Laurie designated herself as the primary card holder and applicant;

g.   ABI knew or should have known that Laurie should have been the person named first on the billing statement at the time of her loss;

h.   ABI knew that Laurie and not Jeffrey was the claimant for unemployment benefits;

    i.    ABI knew or should have known that WF should have mailed a letter addressed to Laurie enclosing ABI's insurance certificates intended for her as the primary card holder and first insured debtor;

    j.    ABI was advised by Laurie on numerous occasions that she was the primary card holder and first insured debtor and that Jeffrey was the co-applicant;

    k.    ABI was advised by Laurie that she signed the WF contract as the first applicant;

    l.    ABI was advised by Laurie that she was the primary card holder and first insured debtor;

    m.    ABI admitted that Laurie was the primary card holder; and

    n.    ABI paid part, although not all, of the Laurie's insurance claim demonstrating her ownership of the policy.

82.    WF and ABI knew or should have known that the unreasonable denial of Laurie's claims for unemployment benefits regarding the two accounts would result in foreseeable damages because ABI made statements that its credit insurance would prevent the exact damages sustained by Laurie and Jeffrey had the claim been paid.

83. ABI agreed to assume a duty toward Laurie and Jeffrey to indemnify and protect Laurie and Jeffrey from the damages they sustained in exchange for the payment of credit insurance premium.

84. Laurie and Jeffrey paid the credit insurance premiums and acquired the contractual right to be protected by ABI against the damages they sustained.

85. ABI's knowing and wrongful refusal to pay lawfully-owed benefits to mitigate against Laurie's involuntary loss of her unemployment was intentional and/or recklessly indifferent to the rights and foreseeable damages of Laurie.

86. ABI was grossly negligent in its knowing and wrongful refusal to pay Laurie her benefits and insure against the losses she sustained.

87. There was no debatable reason that existed to support ABI's denial of Laurie's claims because ABI plainly and unambiguously knew that Laurie was to receive the benefits of the credit insurance in the event she became involuntarily unemployed.

88. There was no reason to delay the benefits provided by the credit insurance because ABI knew or should have known from the date Laurie filed her claim that she was the intended and actual person covered by the unemployment insurance certificates.

89. ABI knew or recklessly disregarded the fact that no valid reasons supported the delay of paying Laurie's claim because she was the primary card holder and first insured debtor and named insured.

90. In the case of ABI's denial of the claim, Laurie and Jeffrey's consequential and extra-contractual economic damages were fairly within the contemplation or should have been in the contemplation of ABI because it made statements intended to induce consumers to seek credit insurance to protect against exactly the damages sustained by Laurie and Jeffrey.

91. In the case of ABI's delay in paying Laurie's claim, Laurie and Jeffrey's consequential economic damages were fairly within the contemplation of ABI because it made statements intended to induce consumers to seek credit insurance to protect against exactly the damages sustained by Laurie and Jeffrey.

**WHEREFORE**, Plaintiffs demand that judgment be entered in their favor and against the Defendants for actual damages, *per quod* damages, consequential damages, punitive damages, costs, reasonable attorney's fees, interest, and other relief as may be just and proper.

**VI.  COUNT TWO**
**(Breach of Good Faith and Fair Dealings)**

92. Plaintiff repeats the foregoing Paragraphs as if each was reprinted herein below.

Deleted: her

Deleted: ,¶
individually, jointly, and/or severally, in an amount in excess of Seventy-Five Thousand¶
($75,000) Dollars, together with interest

Deleted: treble

Deleted: statutory damages,¶
equitable, and such

Deleted: and further

Deleted: this Honorable Court deems

Deleted: ¶
WEISBERG LAW, P.C.¶
¶
¶
/s/ Matthew B. Weisberg¶
Matthew B. Weisberg, Esquire¶
**Attorney**

93. WF and ABI's acts and omissions were inequitable toward Laurie and Jeffrey.

94. WF and ABI did not accord Laurie and Jeffrey good faith in their denial of Laurie's claims.

95. WF and ABI did not accord Laurie and Jeffrey fair dealings in their denial of Laurie's claims.

96. ABI and WF's agent, Tzoumakis, failed to exercise good faith and reasonable skill in advising Laurie and Jeffrey regarding the lines upon which to sign their insurance contracts.

97. ABI and WF failed to honor their fiduciary duties to Laurie and Jeffrey.

98. WF held itself out and stated that it was ABI's agent for the purpose of marketing, selling, and issuing credit insurance on ABI's behalf.

99. WF, ABI, and Tzoumakis owed Laurie and Jeffrey a fiduciary duty to properly advise them on their eligibility for insurance, consider their objectives, and advise them on how to effectuate their objectives.

100. ABI owed Laurie good faith and fair dealings when considering her claim.

101. ABI denied Laurie good faith and fair dealings in denying her claim when it clearly knew, and without any reason to support debate, that she was entitled to benefits as a result of her involuntary unemployment.

102.   When Laurie submitted claims for coverage under the credit insurance, ABI breached its duties requiring good faith and fair dealings.

103.   As a direct and proximate cause of WF and ABI's breach of their duties requiring good faith and fair dealings, Laurie and Jeffrey sustained contractual and extra-contractual damages.

   **WHEREFORE,** Plaintiffs demand that judgment be entered in their favor and against the Defendants for actual damages, *per quod* damages, consequential damages, punitive damages, costs, reasonable attorney's fees, interest, and other relief as may be just and proper.

### VII.  COUNT THREE
### (Breach of Contract)

104.   Plaintiff repeats the foregoing Paragraphs as if each was reprinted herein below.

105.   ABI, Laurie, and Jeffrey entered a credit insurance contract to cover Laurie in the event of her involuntary unemployment.

106.   Laurie and Jeffrey paid premiums to ABI for the credit insurance.

107.   ABI issued insurance to Laurie and Jeffrey.

108.   When Laurie submitted a claim for coverage under the credit insurance, ABI breached the contract by denying the claim.

109.   When Laurie submitted a claim for coverage under the credit insurance, ABI breached the contract by unreasonably delaying the payment of the claim.

110.   When Laurie submitted a claim for coverage under the credit insurance, ABI breached the contract by not paying her the full benefits she was entitled.

111.   As a direct and proximate cause of WF and ABI's breach of contract, Laurie and Jeffrey sustained contractual and extra-contractual damages.

**WHEREFORE**, Plaintiffs demand that judgment be entered in their favor and against the Defendants for actual damages, *per quod* damages, consequential damages, costs, reasonable attorney's fees, interest, and other relief as may be just and proper.

## VIII.  COUNT FOUR
### (New Jersey Consumer Fraud Act)

112.   Plaintiff repeats the foregoing Paragraphs as if each was reprinted herein below.

113.   During the marketing and sale of the credit insurance to Laurie and Jeffrey, and while determining the insurance needs and wants of Laurie and Jeffrey, WF, ABI, and Tzoumakis prepared and drafted documents that listed Laurie as the primary applicant and Jeffrey as the co-applicant.

114.   During the marketing and sale of the credit insurance to Laurie and Jeffrey, and while determining the insurance needs and wants of Laurie and Jeffrey, WF, ABI, and Tzoumakis deceptively and falsely advised them that it did not matter in what order they signed the credit insurance contracts.

115. During the marketing and sale of the credit insurance to Laurie and Jeffrey, and while determining the insurance needs and wants of Laurie and Jeffrey, WF, ABI, and Tzoumakis engaged in an unconscionable business practice by misrepresenting the critical importance of the correct order in which to sign the insurance contract documents.

116. During the marketing and sale of the credit insurance to Laurie and Jeffrey, and while determining the insurance needs and wants of Laurie and Jeffrey, WF, ABI, and Tzoumakis directed and permitted both Laurie and Jeffrey to ambiguously sign the credit insurance contracts when only one of them should have signed, *i.e*., Laurie.

117. The acts and omissions of the Defendants are unfair, deceptive, and unconscionable, and proscribed by N.J.S.A. 56:8-1, *et seq*.

118. As a direct and proximate result of the Defendants' violation of N.J.S.A. 56:8-1, *et seq*., Plaintiffs suffered ascertainable losses.

**WHEREFORE**, Plaintiffs demand that judgment be entered in their favor and against the Defendant for actual damages, statutory damages, treble damages, costs, reasonable attorney's fees, interest, and other relief as may be just and proper.

**Plaintiff demands a trial by jury as to all counts.**

BY:    s/Joseph A. Mullaney, III
              Joseph A. Mullaney, III, Esq.
              **CONSUMER LITIGATION GROUP**
              Law Office of Dimitrios Kolovos, LLC
              211 West State Street, Suite 204
              Media, PA  19063
              Tel 610-616-5303
              Fax 610-672-1944
              Eml JMullaney@ConsumerLitigators.com

| Page 2: [1] Deleted | Author |
|---|---|

Defendant, Wells Fargo North America ("Wells Fargo"), is a corporation, duly organized and existing under the laws of the state of Minnesota, with its corporate headquarters at the above captioned address. Defendant is a citizen of Minnesota.

Defendant, American Bankers Ins. Co. of Florida, is a corporation duly organized and incorporated under the laws of the state of Florida, with a corporate headquarters at the above captioned address. Defendant is a citizen of Florida.

At all times material hereto, Defendants were acting individually, within the course and scope of their authority and employment, and/or through their agents, servants, workers, and/or employees, respectively.

At all times material hereto, Defendants acted on behalf of each other as agents, servants, workmen, alter ego's, and/or employees thereof.

**III.    Operative Facts**

On or about September 9, 2008, Plaintiffs contacted Wells Fargo towards applying for an unsecured personal line of credit for the purpose of home renovations to accommodate their soon-to-be adopted daughter, Angelina.

Plaintiff, Laurie Bowman, had previously been a borrower of Wells Fargo leading her to solicit Wells Fargo for this loan.

After communicating with Wells Fargo, Plaintiffs applied for a personal unsecured line of credit and attended a closing at Wells Fargo.

Defendant, Jane Doe, broker, believed to be an individual named Mary, coordinated the closing on behalf of Defendant, Wells Fargo.

Instead of a personal unsecured line of credit, Mary applied Plaintiff, Laurie Bowman for three loans: (a) an auto finance loan in an amount in excess of $9,000.00; (b) a "cash-on demand" unsecured line of credit in an amount approximately $8,000.00; and (c) an open-end line of credit in the form of a Wells Fargo credit card in an amount approximately $5,000.00.

At all times material hereto, Plaintiff, Laurie Bowman, indicated her intent to be the primary applicant on the aforementioned loans with her husband, Plaintiff, Jeffrey Bowman, to become a co-applicant.

At the time of the closing, Plaintiff, Laurie Bowman, purchased credit life insurance through Wells Fargo, from Defendant, American Bankers Insurance Company of Florida.

The credit life insurance was to insure, among others, that should Plaintiff, Laurie Bowman, become unemployed, all collection activities, as well as Plaintiff, Laurie Bowman's obligation toward payment thereunder, would freeze during that period of unemployment.

The credit life insurance costs approximately $33.00 per loan, which was timely paid.

In or around November, 2008, Plaintiff, Laurie Bowman, became unemployed.

At the time she became unemployed, Plaintiff, Laurie Bowman, submitted a claim under her credit life insurance protection to Wells Fargo and American Bankers Insurance Company of Florida.

At the time she submitted her claim, Plaintiff, Laurie Bowman, discovered: (a) Wells Fargo had switched signing lines between Plaintiffs, Laurie Bowman and Jeffrey Bowman (i.e., Jeffrey was identified as the primary applicant on the three aforementioned loans while Plaintiff, Laurie Bowman, was identified as the co-applicant); and (b) Defendant had approved credit life insurance for two (2) of the three (3) loans (e.g., credit life insurance was available only on the "cash-on-demand" and open-end loans, not the auto finance loan).

Because Wells Fargo had improperly identified Plaintiff, Laurie Bowman, as the secondary applicant instead of the primary applicant, Plaintiff was denied credit life insurance.

Nonetheless, Plaintiff, Laurie Bowman, was still the primary applicant on one (1) of the three (3) loans leading her to call Wells Fargo in an attempt to change her "position" as to the other loan.

Instead of changing the other loan making Plaintiff, Laurie Bowman, the primary applicant for all the loans, Wells Fargo contradictingly changed Plaintiff, Laurie Bowman, to secondary applicant as to both loans.

When Plaintiff, Laurie Bowman, contacted American Bankers, credit life insurer advised Plaintiff, Laurie Bowman, that they did not have a copy of the loans but rather only had Defendant's instructions as to primary versus secondary applicants.

As a result of Plaintiff, Laurie Bowman, being the secondary applicant on the loans, American Bankers denied Plaintiff's credit life insurance claim vis-à-vis Plaintiff, Laurie Bowman's unemployment.

As a result of the denial of the credit life insurance, Defendant bank began collection activities

including calling Plaintiffs separately for each loan (three times per collection attempt) totaling on some occasions over 20 times in a three-week period.

Defendant Bank also attempted to collect debts from Plaintiff, Laurie Bowman, which were not her debts.

Defendants then obtained a judgment against Jeffrey Bowman and then executed upon that judgment by executing on a bank account held by Plaintiff, Laurie Bowman.

**COUNT I**
**Fraud Act (CFA)**

The CFA prescribes, inter alia, engaging in any "unfair or deceptive acts and practices" either at, prior to, or subsequent to a consumer transaction.

The actions of Defendants constitute unfair or deceptive acts and practices under the CFA.

The aforementioned acts of Defendants constitute a violation of the CFA.

As a direct and proximate result of the Defendants' aforementioned violation of the CFA, Plaintiffs have suffered great economic loss, as well as humiliation, embarrassment, and emotional distress, damage to their credit rating, future earnings and future lost earning capacity and other damages or losses.